United States District Court
Southern District of Texas
**ENTERED**
February 20, 2019
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

LEROY MONTREL SCOTT,                §
                                    §
          Plaintiff,                §
                                    §
v.                                  §    CIVIL ACTION NO. H-18-0505
                                    §
NANCY A. BERRYHILL,                 §
ACTING COMMISSIONER OF THE          §
SOCIAL SECURITY ADMINISTRATION,     §
                                    §
          Defendant.                §

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] are Plaintiff's Motion for Summary Judgment (Doc. 15) and Defendant's Cross-Motion for Summary Judgment (Doc. 11). The court has considered the motions, the responses, the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Defendant's motion be **GRANTED** and Plaintiff's motion be **DENIED**.

## I.  Case Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Social Security Administration ("SSA") Commissioner ("Commissioner" or "Defendant") regarding Plaintiff's claim for disability insurance benefits under Title II and for supplemental security income under Title XVI of the Social Security Act ("the Act").

---

[1]     This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  See Doc. 9, Ord. Dated May, 2, 2018.

## A.  <u>Medical History</u>[2]

Plaintiff was born on June 27, 1972, and was 41 years old on the alleged disability onset date of May 30, 2014.[3]

Plaintiff was injured on May 30, 2014, when he was in a head-on collision with a drunk driver.[4]  Plaintiff had to be extricated from the vehicle and was taken to Ben Taub General Hospital ("BTGH") where he received emergency medical services.[5]  Plaintiff was diagnosed with a grade two open left fibula fracture and a patella fracture.[6]  Plaintiff reported left leg pain and denied pain elsewhere.[7]  Plaintiff was able to wiggle all of his toes, but not extend his left knee.[8]

After more time had passed, Plaintiff reported neck pain, back pain, and leg pain.[9]  CT scans were ordered of Plaintiff's head, spine, chest, abdomen, and pelvis.[10]  X-rays were ordered of Plaintiff's left leg, knee, and ankle.[11]  The CT scans did not

---

[2]    Many of Plaintiff's medical records are duplicative of each other. The court will only cite to one record when there are duplicate medical records.

[3]    <u>See</u> Doc. 8, Tr. of the Admin. Proceedings ("Tr.") 195.

[4]    <u>See</u> Tr. 51, 320.

[5]    <u>See</u> Tr. 320.

[6]    <u>See</u> Tr. 361.

[7]    <u>See</u> Tr. 361.

[8]    <u>See</u> Tr. 362.

[9]    <u>See</u> Tr. 365.

[10]    <u>See</u> Tr. 365, 396-410.

[11]    <u>See</u> Tr. 365, 379.

reveal any abnormalities in Plaintiff's head, spine, chest, abdomen, or pelvis.[12]  The X-rays revealed that Plaintiff had: (1) a "[c]omminuted, displaced fracture of the patella with overlying soft tissue laceration, swelling and subcutaneous emphysema[;]" and (2) a "[f]racture of the fibula shaft with [one] shaft width posterior displacement" and an "[a]djacent [nine] centimeter soft tissue laceration."[13]  The X-ray of Plaintiff's ankle did not reveal any medical issues.[14]

On the morning of June 1, 2014, a "[p]artial patellectomy with advancement" was performed on Plaintiff's left patella and a "debridement of open fracture" was performed on Plaintiff's left fibula.[15]  During the surgery, an unrepairable laceration of Plaintiff's extensor hallucis longus ("EHL") muscle belly was discovered.[16]  Following the surgery, Plaintiff was admitted for 72 hours.[17]  Plaintiff was released from BTGH on June 3, 2014, with prescriptions for Colace and Norco and instructed to not bear weight on his left leg.[18]

---

[12]   See Tr. 369.

[13]   See Tr. 394.

[14]   See Tr. 379.

[15]   See Tr. 356.

[16]   See Tr. 356.

[17]   See Tr. 358.

[18]   See Tr. 354-355.

Plaintiff returned to BTGH for a follow-up on June 13, 2018.[19] At the follow-up, Plaintiff was able to wiggle all of his toes and was prescribed more Colace and Norco.[20]  Plaintiff returned to BTGH on June 26, 2018, and was given a hinged knee brace and prescribed additional Norco.[21]  Plaintiff returned for another follow-up at BTGH on July 23, 2014.[22]  At the follow-up, Plaintiff's brace was unlocked from zero to sixty degrees and he was prescribed Tramadol.[23]  Plaintiff's next follow-up occurred on September 17, 2014, where David Sun, M.D. ("Dr. Sun"), observed that: (1) Plaintiff's overall pain was improved with occasional sharp knee pain and swelling; and (2) Plaintiff had weakness of extension of his big toe and numbness to the dorsum of his left foot.[24]

On October 2, 2014, Plaintiff was seen by Terry L. McDermott, M.D. ("Dr. McDermott") for progressive blurring of his vision and a loss of visual acuity.[25]  Plaintiff claimed that he was noticing an episodic presence of black spots and had recurrent headaches.[26] On October 15, 2014, Plaintiff returned to Dr. McDermott and

---

[19]     See Tr. 346.

[20]     See Tr. 346.

[21]     See Tr. 341-344.

[22]     See Tr. 333.

[23]     See Tr. 333-334.

[24]     See Tr. 328.

[25]     See Tr. 552.

[26]     See Tr. 552.

4

complained of insomnia and frequent migraines related to his car accident.[27]  At the time, Plaintiff was feeling stressed because he was unable to work.[28]  Dr. McDermott diagnosed Plaintiff with post-traumatic stress disorder ("PTSD") and insomnia.[29]  Dr. McDermott also prescribed Plaintiff Paxil and referred him to specialists for PTSD and insomnia.[30]

Plaintiff was seen for a follow-up appointment on October 16, 2014, where Dr. Sun noted that Plaintiff was still experiencing occasional sharp knee pain, weakness of extension in his big toe, and numbness to the dorsum of his left foot.[31]  Dr. Sun also observed that Plaintiff was able to bend his knee from zero to ninety degrees.[32]

On October 20, 2014, Plaintiff was seen by Allison M. Harter ("Harter"), a therapist, for his PTSD.[33]  Plaintiff reported feeling "down and stressed" and stated that he suffered from difficulty sleeping, nightmares, and flashbacks to the accident.[34]  Plaintiff also stated that he startled easily at loud noises and was stressed

---

[27]    See Tr. 602.

[28]    See Tr. 602.

[29]    See Tr. 604.

[30]    See Tr. 604.

[31]    See Tr. 322.

[32]    See Tr. 322.

[33]    See Tr. 418.

[34]    See Tr. 418.

about his finances.[35]  Harter diagnosed Plaintiff with depression and PTSD.[36]  On November 13, 2014, Plaintiff was seen by Harter and reported continued difficulty sleeping and panic attacks in cars or loud areas.[37]

On December 11, 2014, Plaintiff was seen by Fernando D. Nussenbaum, M.D. ("Dr. Nussenbaum").[38]  At the appointment, Plaintiff expressed that he was experiencing: (1) occasional sharp pain in his knee; (2) weakness of extension of his big toe; and (3) numbness to the dorsum of his left foot.[39]  Plaintiff was able to bend his knee from zero to 105 degrees.[40]  Plaintiff was also seen by Dr. McDermott on December 11, 2014.[41]  Dr. McDermott referred Plaintiff to LBJ Sleep Services Lab for a sleep study due to Plaintiff's continued sleeping issues.[42]

On December 15, 2014, J.L. Paterson, Ph.D ("Dr. Paterson"), a psychologist, conducted a clinical interview and mental status examination of Plaintiff and rendered a consultative opinion on

---

[35]    See Tr. 419.

[36]    See Tr. 421.

[37]    See Tr. 620.

[38]    See Tr. 522.

[39]    See Tr. 522.

[40]    See Tr. 522.

[41]    See Tr. 447.

[42]    See Tr. 447-449.

6

Plaintiff's mental health limitations.[43]   Dr. Paterson generally observed that: (1) Plaintiff "was casually dressed and his personal hygiene appeared good [;]" (2) Plaintiff's "[g]ross motor movements were fluid however he used a cane[;]" (3) Plaintiff "can verbally express himself adequately[;]" and (4) Plaintiff "was cooperative during the exam."[44]   In assessing Plaintiff's activities of daily living, Dr. Paterson observed that: (1) Plaintiff "is able to bathe and dress himself however personal hygiene activities take longer than previously[;]" (2) Plaintiff "can feed himself however he does very little housework and cooking[;]" (3) Plaintiff has been unable to drive since his accident and relies on friends to drive him; (4) Plaintiff's "[s]ocialization has declined" and he was socially outgoing prior to his accident; (5) Plaintiff "is easily upset since his accident" and "[t]raffic is especially stressful as he rides with another driver[;]" (6) Plaintiff could adequately communicate, read, and write; (7) Plaintiff "stated that he is easily distracted[;]" (8) Plaintiff watches television in his free time[;]" and (9) Plaintiff cannot shop so his parents shop for him.[45]   Regarding Plaintiff's mental status Dr. Paterson observed that: (1) he reported feeling depressed and anxious daily, and "appeared depressed throughout the exam[;]" (2) his "thought

---

[43]   See Tr. 426.

[44]   See Tr. 426-427.

[45]   See Tr. 428.

processes were logical and coherent[;]" (3) his immediate memory was deficient, his recent memory was intact, and his memory for remote events was intact; (4) his concentration was fair; (5) his intellectual functioning was in the average range; (6) his abstract thinking was fair; (7) his insight and judgment was intact; and (8) he "was oriented to person, place, and time."[46]

Dr. Paterson diagnosed Plaintiff with moderate major depressive disorder ("MDD") and PTSD.[47]  Regarding Plaintiff's functional capacity, Dr. Paterson opined that: (1) Plaintiff "has difficulty completing simple one-two step tasks[;]" (2) Plaintiff's "[c]oncentration and socialization have declined since his injury[;]" and (3) Plaintiff "is unable to deal with the stressors of the normal workplace."[48]

January 15, 2015, Plaintiff was seen by Dr. McDermott.[49]  Dr. McDermott observed that the healing of Plaintiff's leg was progressing.[50]  Dr. McDermott noted that Plaintiff had been experiencing anxiety and PTSD and that he had been having trouble completing the previously ordered sleep study.[51]

On January 16, 2015, Plaintiff was seen by Suni Jani, M.D.,

---

[46]   See Tr. 429.

[47]   See Tr. 429.

[48]   See Tr. 429-430.

[49]   See Tr. 514.

[50]   See Tr. 514.

[51]   See Tr. 515.

M.P.H. ("Dr. Jani"), for a mental health evaluation.[52]   In conducting Plaintiff's mental status examination, Dr. Jani observed that: (1) his general appearance and behavior was "well groomed with cane, tearful but cooperative[;]" (2) there were no abnormalities in his muscle strength or gait; (3) he was awake, alert, and properly oriented to person, place, time, and situation; (4) his mood was bad and his affect was tearful; (5) his thought processes were logical, linear, and goal-directed; and (6) his memory, attention span, concentration, insight, and judgment were fair.[53]  Dr. Jani diagnosed Plaintiff with PTSD and depression and found that Plaintiff had a "moderate functional impairment."[54]  Dr. Jani determined that the best course of action was to continue therapy and discontinue Plaintiff's Paxil prescription.[55]  Dr. Jani also prescribed Plaintiff Zoloft for his PTSD and Prazosin for his nightmares.[56]

Plaintiff was seen again by Dr. Jani on March 20, 2015.[57] Plaintiff was late for the appointment and stated that he did not get his prescriptions from his last appointment filled due to lack

---

[52]   See Tr. 476.

[53]   See Tr. 478-479.

[54]   See Tr. 479-480.

[55]   See Tr. 479.

[56]   See Tr. 479.

[57]   See Tr. 701.

of funds.[58]  Plaintiff also stated that he: (1) was still having flashbacks and difficulty in public; (2) had increased distress with his children who had kicked him out and were not talking to him; (3) felt hopeless, socially isolated, on guard, anxious, and like "less of a man" due to his dependence on others; (4) experienced regular nightmares and difficulty sleeping; and (5) had "thoughts of death given he feels hopeless."[59]  In conducting Plaintiff's mental status examination, Dr. Jani again observed that: (1) his general appearance and behavior was "well groomed with cane, tearful but cooperative[;]" (2) there were no abnormalities in his muscle strength or gait; (3) he was awake, alert, and properly oriented to person, place, time, and situation; (4) his mood was bad and his affect was tearful; (5) his thought processes were logical, linear, and goal-directed; and (6) his memory, attention span, concentration, insight, and judgment were fair.[60]  Dr. Jani again diagnosed Plaintiff with depression and PTSD, and found that Plaintiff had a "moderate functional impairment."[61]  Dr. Jani again instructed Plaintiff to discontinue taking Paxil and prescribed Prazosin and Sertraline.[62]

---

[58]     See Tr. 701.

[59]     See Tr. 701.

[60]     See Tr. 702-703.

[61]     See Tr. 704.

[62]     See Tr. 704.

10

Plaintiff was seen by Dr. McDermott on March 23, 2015.[63]  At the appointment, Plaintiff reported that the swelling in his knee had decreased and that he was concerned about possible instability in his joint when it bore weight.[64]  Plaintiff also reported difficulty affording his prescriptions.[65]  Plaintiff had another follow-up appointment on March 30, 2015, where he was referred to physical therapy and given a prescription for Gabapentin to be taken with his Tramadol.[66]  Plaintiff also had X-rays taken at the appointment.[67]  The X-rays revealed that his leg was "in the late stages of healing."[68]  Plaintiff had a follow-up appointment on April 1, 2015, where Dr. McDermott discussed the X-rays and a pain medication agreement with Plaintiff.[69]

Plaintiff was seen by Dr. Jani on May 1, 2015.[70]  In conducting Plaintiff's mental status examination, Dr. Jani observed that: (1) his general appearance and behavior was "well groomed with cane, tearful but cooperative[;]" (2) he walked with a limp and a cane; (3) he was awake, alert, and properly oriented to person, place,

---

[63]     See Tr. 506.

[64]     See Tr. 507.

[65]     See Tr. 507.

[66]     See Tr. 500.

[67]     See Tr. 612.

[68]     See Tr. 612.

[69]     See Tr. 494.

[70]     See Tr. 636.

time, and situation; (4) his mood was bad and his affect was dysthymic; (5) his thought processes were logical, linear, and goal-directed; and (6) his memory, attention span, concentration, insight, and judgment were fair.[71]   Dr. Jani again diagnosed Plaintiff with depression and PTSD, and found that Plaintiff had a "moderate functional impairment."[72]   Dr. Jani increased Plaintiff's Sertaline and Prazosin prescriptions and prescribed Plaintiff Atarax.[73]

Plaintiff was seen for leg pain on May 7, 2015, by Rachell A. Nguyen ("Nguyen"), a nurse practitioner.[74]   Plaintiff sought a refill on his Norco prescription because Tramadol and NSAIDs were not working.[75]   Nguyen explained that nurse practitioners cannot prescribe Norco and prescribed Plaintiff Robaxin-750 and Motrin.[76] Plaintiff was seen again for leg pain on May 15, 2015, by Jaime Cazares, M.D. ("Dr. Cazares").[77]   Plaintiff stated that his pain medications were still not working.[78]   Dr. Cazares prescribed

---

[71]     See Tr. 637.

[72]     See Tr. 638-639.

[73]     See Tr. 638.

[74]     See Tr. 650.

[75]     See Tr. 651.

[76]     See Tr. 653.

[77]     See Tr. 786.

[78]     See Tr. 786.

Plaintiff acetaminophen-codeine tablets for his pain.[79]

On May 21, 2015, Linda C. Epner, M.D. ("Dr. Epner"), conducted an eye exam on Plaintiff.[80]  Dr. Epner diagnosed Plaintiff with an "[u]nspecified disorder of refraction and accommodation" and "primary open-angle glaucoma."[81]  Dr. Epner prescribed Plaintiff Cosopt and Xalatan eye drops.[82]

On May 27, 2015, Plaintiff was seen by Cynthia Obi, M.D. ("Dr. Obi"), for a walk-in appointment at Methodist West Houston.[83] Plaintiff was complaining of an episode of pain in his left leg.[84] Dr. Obi found that "[a]t their worst [Plaintiff's physical] symptoms were mild . . . ."[85]  Dr. Obi noted that Plaintiff had been taking Norco for the pain and he had recently run out of Norco.[86] During the appointment, Plaintiff "was seen ambulating to the restroom without difficulty."[87]  Dr. Obi prescribed Plaintiff Toradol and instructed him to follow up with his orthopedic

---

[79]    See Tr. 788.

[80]    See Tr. 670.

[81]    See Tr. 671.

[82]    See Tr. 672.

[83]    See Tr. 760.

[84]    See Tr. 761.

[85]    See Tr. 761.

[86]    See Tr. 761.

[87]    See Tr. 762.

surgeon.[88]

On June 10, 2015, Plaintiff was seen by Christopher H. Perkins, M.D. ("Dr. Perkins"), at the BTGH Orthopedic Surgery Clinic.[89]  Plaintiff sought an evaluation of his chronic left knee pain.[90]  Dr. Perkins noted that: (1) the incisions from Plaintiff's surgery were well-healed; (2) Plaintiff was hypersensitive to touch over the incisions; (3) Plaintiff was able to extend his knee from zero to 120 degrees; and (4) Plaintiff had weakness in his EHL muscle."[91]  Dr. Perkins instructed Plaintiff to seek a pain management referral from his primary-care physician.[92]  X-rays taken during the visit showed no new abnormalities and that the patellar fracture was healed.  However, the X-rays also revealed a "[h]ealed fracture deformity in the mid fibular diaphysis with unchanged alignment."[93]

Plaintiff was seen by Dr. Cazares on June 30, 2015.[94] Plaintiff complained of knee pain at the appointment.[95]  Dr. Cazares noted that: (1) there was no instability in Plaintiff's bilateral knees;

---

[88]     See Tr. 762.

[89]     See Tr. 681.

[90]     See Tr. 681.

[91]     See Tr. 683.

[92]     See Tr. 683.

[93]     See Tr. 695.

[94]     See Tr. 722.

[95]     See Tr. 722.

14

(2) the "draw sign" test was negative in both knees; and (3) both of Plaintiff's legs and knees were nontender.[96]   Dr. Cazares prescribed Plaintiff acetaminophen-codeine tablets for his pain.[97]

On August 11, 2015, Plaintiff was seen by Aleksandra Lawera, M.D.("Dr. Lawera"), as a new patient.[98]   Plaintiff complained of left lower leg and knee pain.[99]   As a part of the new patient screening, Plaintiff was asked the following questions: (1) "Over the last two weeks, have you . . .[h]ad little interest or pleasure in doing things?[;]" (2) "Over the last two weeks, have you . . . [b]een feeling down, depressed, or hopeless?[;]" (3) "Over the last two weeks, have you been . . . [f]eeling nervous, anxious, or on edge?[;]" and (4) Over the last two weeks, have you been . . . unable to stop or control worrying?"[100]   To all four questions, Plaintiff responded "not at all."[101]   Dr. Lawera noted that Plaintiff had "no depression, anxiety, or agitation."[102]   Plaintiff was prescribed Norco and Tramadol for his pain.[103]

On August 14, 2015, Plaintiff had a follow-up mental health

---

[96]     See Tr. 723.

[97]     See Tr. 723.

[98]     See Tr. 817.

[99]     See Tr. 819.

[100]     See Tr. 818.

[101]     See Tr. 818.

[102]     See Tr. 820.

[103]     See Tr. 820.

appointment with Shirali S. Patel, M.D. ("Dr. Patel").[104]   Plaintiff reported that he was still having panic attacks and nightmares.[105] In conducting Plaintiff's mental status examination, Dr. Patel observed that: (1) his general appearance and behavior was "well groomed with cane, calm, [and] cooperative[;]" (2) he walked with a limp and a cane; (3) he was awake, alert, and grossly oriented to person, place, time, and situation; (4) his mood was "ok" and his affect was dysthymic but stable; (5) his thought processes were logical, linear, and goal-directed; and (6) his memory, attention span, concentration, insight, and judgment were fair.[106]   Dr. Patel diagnosed Plaintiff with depression and PTSD, and found that Plaintiff had a "moderate functional impairment."[107]   Dr. Patel increased Plaintiff's Sertaline prescription and continued his Prazosin and Atarax prescriptions.[108]

Plaintiff was seen again by Dr. Patel on December 18, 2015.[109] At the appointment, Plaintiff was walking without a cane because it was being repaired.[110]   Plaintiff stated that his medication was

---

[104]   See Tr. 830.

[105]   See Tr. 831.

[106]   See Tr. 832.

[107]   See Tr. 833.

[108]   See Tr. 833.

[109]   See Tr. 943

[110]   See Tr. 943.

"doing pretty good overall" and "helping him stay calm."[111] Plaintiff's nightmares and irritability had improved, but he still had some sadness.[112] Dr. Patel's mental status observations were unchanged from the August 14, 2015.[113] Dr. Patel increased Plaintiff's Sertraline and Prazosin prescriptions and continued Plaintiff's Atarax prescription.[114]

On January 7, 2016, Plaintiff was seen by Harter for a follow-up appointment.[115] Plaintiff indicated that he was feeling down and stressed about what to do next in life and that he was still having nightmares, difficulty sleeping, and flashbacks to his accident.[116] Plaintiff scored a fourteen out of twenty-seven on his PHQ-9, a score consistent with moderate depression.[117] Plaintiff's mental status examination was generally consistent with his previous examinations except that his affect was described as "[f]ull range, appropriate."[118] Harter diagnosed Plaintiff with moderate MDD and PTSD.[119]

---

[111]    See Tr. 943.

[112]    See Tr. 943.

[113]    See Tr. 944.

[114]    See Tr. 943.

[115]    See Tr. 926.

[116]    See Tr. 926.

[117]    See Tr. 926-927.

[118]    See Tr. 927-928.

[119]    See Tr. 928.

Plaintiff was seen for a follow-up eye examination on January 13, 2016, where he was prescribed Alphagan eye drops and his Xalatan and Cosopt eye-drop prescriptions were continued.[120]

Plaintiff was seen for a follow-up appointment by Harter on February 2, 2016, where his diagnoses and examinations were unchanged from his previous appointment.[121]

On February 19, 2016, Plaintiff had a follow-up psychiatry appointment by Diana I. Prieto, M.D. ("Dr. Prieto").[122] Plaintiff's PHQ-9 score had decreased from fourteen to eleven. Dr. Prieto's mental status examination was the same as Dr. Patel's at the December 18, 2015, visit.[123] Dr. Prieto diagnosed Plaintiff with MDD and PTSD, and found that Plaintiff had a moderate functional impairment.[124] Dr. Prieto continued Plaintiff's prescriptions, but did not increase dosage or add any new ones.[125]

Plaintiff was seen by Harter on March 8, 2016, where his diagnoses and examinations were generally unchanged from his previous appointment except that his PHQ-9 score increased to twelve.[126]

---

[120]   See Tr. 918, 923.

[121]   See Tr. 909-911.

[122]   See Tr. 898.

[123]   See Tr. 899.

[124]   See Tr. 900.

[125]   See Tr. 900.

[126]   See Tr. 909-911.

Plaintiff had a follow-up psychiatry appointment with Dr. Prieto on May 6, 2016.[127] Plaintiff stated that he had been taking his medication, however, Dr. Prieto noted that Plaintiff had not filled his prescriptions since February.[128] Plaintiff's PHQ-9 score was a twelve, and his mental status examination and diagnoses were unchanged from his previous appointment with Dr. Prieto.[129] Dr. Prieto continued Plaintiff's prescriptions.[130]

Plaintiff had a follow up psychiatry appointment with Christina B. Smith, M.D. ("Dr. Smith"), on August 9, 2016.[131] Plaintiff reported numerous difficulties, yet, he claimed that his medications were working.[132] Plaintiff had not filled his prescriptions in two months, and when confronted, Plaintiff claimed adherence to his medication plan.[133] In conducting Plaintiff's mental status examination, Dr. Smith observed that: (1) his general appearance and behavior was "dressed casually, direct eye contact, good grooming and hygiene, uses cane[;]" (2) he had a slow gait; (3) he was alert and oriented; (4) his mood was "down" and his affect was constricted; (5) his thought processes were linear and

---

[127]   See Tr. 874.

[128]   See Tr. 874.

[129]   See Tr. 874-876.

[130]   See Tr. 876.

[131]   See Tr. 842.

[132]   See Tr. 842.

[133]   See Tr. 842.

goal-directed; and (6) his memory was grossly intact and his attention span, concentration, insight, and judgment were fair.[134] Dr. Smith diagnosed Plaintiff with MDD and PTSD, and continued Plaintiff's medication regimen.[135]

Plaintiff was seen by Irene E. Cornell-Ade, M.D., ("Dr. Cornell-Ade"), on December 1, 2016, for knee pain.[136] At the appointment, Plaintiff indicated that his orthopedic surgeon had recommended a knee replacement, but he refused to have the surgery.[137] Plaintiff also indicated that he had been getting a Norco prescription from an outside source, but could no longer afford it because he had to pay out of pocket and had run out of money.[138] Dr. Cornell-Ade offered Plaintiff a steroid injection, but he declined and stated that he only wanted Norco.[139] Plaintiff became upset during his interaction with Dr. Cornell-Ade.[140] Dr. Cornell-Ade, increased Plaintiff's Gabapentin prescription, encouraged Plaintiff to explore options other than Norco, and diagnosed Plaintiff with chronic knee pain and "[d]rug-seeking

---

[134]   See Tr. 843-844.

[135]   See Tr. 844-845.

[136]   See Tr. 976.

[137]   See Tr. 977.

[138]   See Tr. 979.

[139]   See Tr. 979.

[140]   See Tr. 979.

behavior."[141]

On December 6, 2016, Plaintiff was seen by Jin Yong Han, M.D. ("Dr. Han"), for a follow-up psychiatry appointment.[142]  Plaintiff stated that he felt his current medication regimen was working. Plaintiff reported that he felt depressed at times, but that he had improved a lot over time.[143]  Plaintiff claimed to still be experiencing nightmares and felt worthless at times.[144]  Plaintiff's PHQ-9 score had decreased to a nine, which was consistent with mild depression.[145]  In conducting Plaintiff's mental status examination, Dr. Han observed that: (1) Plaintiff's general appearance and behavior was "cooperative, good eye contact, well groomed, [and] polite[;]" (2) he was "limping and ambulating with a cane"; (3) his mood was "down sometimes" and his affect was constricted; (5) his thought processes logical and goal-directed; and (6) his memory was intact and his attention had decreased; and (7) his fund of knowledge, insight, and judgment were somewhat fair.[146]  Dr. Han diagnosed Plaintiff with MDD and PTSD, and continued Plaintiff's medication without adjustment.[147]

---

[141]   See Tr. 980.

[142]   See Tr. 961.

[143]   See Tr. 961.

[144]   See Tr. 961.

[145]   See Tr. 927, 961-962.

[146]   See Tr. 963-964.

[147]   See Tr. 964.

## B.  Application to SSA

Plaintiff applied for disability insurance benefits and/or supplemental security income benefits claiming an inability to work since May 30, 2014, due to depression and a shattered left leg and knee cap.[148]

On December 30, 2014, the SSA found Plaintiff not disabled at the initial level of review.[149]  On April 1, 2015, the SSA again found Plaintiff not disabled upon reconsideration.[150]

Plaintiff requested a hearing before an ALJ.[151]  The ALJ granted Plaintiff's request and scheduled the hearing on December 20, 2016.[152]

## C.  Hearing

At the hearing, Plaintiff and a vocational expert, Rosalind Lloyd ("Lloyd"), testified.[153]  Plaintiff was represented by an attorney.[154]

Plaintiff testified that he lived with his mother and shared joint custody of his two children with his ex-wife.[155]  Plaintiff

---

[148]   See Tr. 237.

[149]   See Tr. 120.

[150]   See Tr. 129.

[151]   See Tr. 136.

[152]   See Tr. 39.

[153]   See Tr. 40.

[154]   See Tr. 41.

[155]   See Tr. 43.

22

has a high school education.[156]   Plaintiff worked as a barber for ten years before beginning a job as a truck driver for McLean Food Services in 2006.[157]   Plaintiff worked for McLean until 2008. Plaintiff began working at Staples, Inc., as a truck driver in 2011.[158]   Plaintiff worked at Staples until 2013 when he began working as a Fed Ex driver.[159]   Plaintiff worked at Fed Ex until 2014 when he began working as a driver at United Vision.[160] Plaintiff worked at United Vision until his accident and has not worked since.[161]

Plaintiff testified that he was injured on May 30, 2014, when he was in a head-on collision with a drunk driver.[162]   The collision shattered bones in Plaintiff's left leg and kneecap.[163]   Plaintiff's leg bone popped through his skin and tore muscles controlling three of his toes.[164]   Plaintiff walks with a cane because he is unable to control the affected toes and has trouble balancing as a result.[165]

---

[156]   See Tr. 43.

[157]   See Tr. 244.

[158]   See Tr. 44-45, 244.

[159]   See Tr. 44, 244.

[160]   See Tr. 43-44, 244.

[161]   See Tr. 44.

[162]   See Tr. 51.

[163]   See Tr. 51.

[164]   See Tr. 52.

[165]   See Tr. 52.

It is difficult for Plaintiff to sit for an extended period of time without elevating his leg.[166]   It is similarly difficult for Plaintiff to stand for a long period of time.[167]

During the accident, Plaintiff was hit in the face with the airbag and became trapped inside of the vehicle while it was smoking.[168]  As a result, Plaintiff testified that he has nightmares of the incident and wakes up thinking about the accident.[169] Plaintiff takes Zoloft to address these symptoms.[170]  Plaintiff also has issues with his vision caused by the airbag hitting his face.[171] As a result, Plaintiff takes three different eye drops each day.[172] When taken, the eye drops temporarily sting Plaintiff's eyes and cause his vision to blur for up to an hour.[173]

The ALJ questioned Lloyd next.  The ALJ began by describing a hypothetical person who: (1) was limited to sedentary work; (2) could only occasionally use ramps and stairs; (3) could never use ladders, ropes, and scaffolds; (4) could occasionally stoop, kneel,

---

[166]    See Tr. 52-53.

[167]    See Tr. 52-53.

[168]    See Tr. 53-55.

[169]    See Tr. 53-54.

[170]    See Tr. 54.

[171]    See Tr. 55.

[172]    See Tr. 55.

[173]    See Tr. 55-57.

and crouch; and (5) could never crawl or balance.[174]   This hypothetical person would avoid unprotected heights and hazardous machinery.[175]   They "would also be limited to simple, routine work with only occasional interaction with the public, coworkers, and supervisors."[176]   Lloyd testified that the hypothetical person would be unable to return to Plaintiff's past relevant work.[177]   The hypothetical person with Plaintiff's limitations would be able to work as document preparer, callout operator, or surveillance system monitor.[178]

Next, the ALJ added the limitation of needing to lie down for two hours during an eight-hour work period.[179]   Lloyd testified that a hypothetical person with this added limitation would be unable to work.[180]

## D.   **Commissioner's Decision**

On January 17, 2017, the ALJ issued an unfavorable decision.[181] The ALJ found that Plaintiff's date last insured ("DLI") was March 31, 2018, and that Plaintiff had not engaged in substantial gainful

---

[174]   <u>See</u> Tr. 60.

[175]   <u>See</u> Tr. 60.

[176]   <u>See</u> Tr. 60.

[177]   <u>See</u> Tr. 60.

[178]   <u>See</u> Tr. 60.

[179]   <u>See</u> Tr. 61.

[180]   <u>See</u> Tr. 61.

[181]   <u>See</u> Tr. 17.

activity from May 30, 2014, the alleged onset date, through the date of the ALJ's decision.[182]   The ALJ recognized the following impairments as severe: "status post left leg fracture and post-traumatic stress disorder."[183]   The ALJ found that Plaintiff's severe impairments, individually or collectively, did not meet or medically equal the disorders described in the listings of the regulations[184] (the "Listings").[185]   At the Listing step, the ALJ found that Plaintiff did not meet the requirements of any Listing, addressing Listings Sections 1.06 (fracture of the femur, tibia, pelvis, or tarsal bones) and 12.06 (anxiety and obsessive-compulsive disorders).[186]

The ALJ found that Plaintiff did not meet the requirements of Section 1.06 because: (1) "a solid union is evident on appropriate medically acceptable imaging and clinically solid;" (2) "there is an ability to ambulate effectively;" and (3) "return to ambulation occurred within 12 months of onset."[187]   The ALJ considered the Paragraph B and Paragraph C criteria when determining if Plaintiff met the requirements of Section 12.06.[188]   The ALJ found that

---

[182]   See Tr. 22.

[183]   See Tr. 23.

[184]   20 C.F.R. Pt. 404, Subpt. P, App. 1.

[185]   See Tr. 23.

[186]   See Tr. 23.

[187]   See Tr. 23.

[188]   See Tr. 23.

Plaintiff did not meet the requirements of Section 12.06 Paragraph B because Plaintiff's "mental impairment does not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration."[189]  The ALJ found that Plaintiff did not meet the requirements of Section 12.06 Paragraph C because there is no evidence of: (1) "repeated episodes of decompensation, each of extended duration;" (2) "a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause [Plaintiff] to decompensate;" or (3) "a current history of [one] or more years' inability to function outside of a highly supportive living arrangement, with an indication of continued need for such an arrangement."[190]

In determining Plaintiff's residual functional capacity ("RFC"), the ALJ discussed Plaintiff's injuries, symptoms, and medical treatment.[191]  The ALJ found that Plaintiff's statements were "not entirely consistent regarding the severity of his symptoms and their effect on his ability to perform work related activities."[192]

---

[189]    See Tr. 24.

[190]    See Tr. 24.

[191]    See Tr. 24-30.

[192]    See Tr. 25.

The ALJ found that Plaintiff could perform sedentary work except that: (1) he could only occasionally climb ramps or stairs, never climb ladders, ropes, or scaffolds; (2) he could only occasionally stoop, kneel, and crouch; (3) he could never crawl or balance; (4) he must avoid all exposure to unprotected heights and hazardous machinery; (5) he can perform simple, routine work; and (6) can have occasional interaction with the public, coworkers, and supervisors.[193]   The ALJ determined that, while Plaintiff could not perform his past relevant work, he could perform other jobs in the national or regional economy, such as document preparer, call out operator, and surveillance system monitor, and was therefore not disabled.[194]

Plaintiff appealed the ALJ's decision, and, on November 21, 2017, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[195]   After receiving the Appeals Council's denial, Plaintiff timely sought judicial review of the decision by this court.[196]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner

---

[193]   See Tr. 24.

[194]   See Tr. 31-32.

[195]   See Tr. 1-7.

[196]   See Doc. 1, Pl.'s Compl.

denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.  **Legal Standard**

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe

impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and [RFC] must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 404.1520.  The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

## B.  Substantial Evidence

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  It is "something more than a scintilla but less than a preponderance." Id.  The Commissioner has the responsibility of deciding any conflict in the evidence. Id.  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.  42 U.S.C. § 405(g).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  See Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide

the issues de novo, or substitute the court's judgment for the Commissioner's judgment.  <u>Brown v. Apfel</u>, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  <u>Id.</u>

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  Plaintiff asserts that the ALJ's decision contains the following errors: (1) the ALJ improperly gave little weight to the only opinions about Plaintiff's mental capabilities that came from a medical expert; and (2) the ALJ determined Plaintiff's mental capabilities without an interpretative expert opinion.[197]  Defendant argues that the ALJ's decision is legally sound and is supported by substantial evidence.  Plaintiff only contests the ALJ's determinations made at the fifth step of the review process and only in reference to Plaintiff's mental capabilities.[198]

### A.   <u>Weight Given to Consultative Opinions</u>

The ALJ gave little weight to the consultative opinion of Dr. Paterson finding that Dr. Paterson's opinion was not consistent with the administrative record as a whole.[199]  On December 15, 2014,

---

[197]   <u>See</u> Doc. 16, Pl.'s Mot. for Summ. J. p. 12-13.

[198]   <u>See</u> <u>id.</u> p. 10-11.

[199]   <u>See</u> Tr. 27, 30.

Dr. Paterson opined that: (1) Plaintiff "has difficulty completing simple one-two step tasks[;]" (2) Plaintiff's "[c]oncentration and socialization have declined since his injury[;]" and (3) Plaintiff "is unable to deal with the stressors of the normal workplace."[200]

The ALJ must evaluate every medical opinion in the record and decide what weight to give each.  See 20 C.F.R. § 404.1527(c). In determining what weight to give a medical opinion by a non-treating physician, the ALJ considers the: (1) examining relationship; (2) treatment relationship; (3) the supportability of the opinion; (4) the opinion's consistency with the record; (5) whether the opining physician is an expert; and (6) any other relevant factors.  See id.

The ALJ gave little weight to Dr. Paterson's opinion primarily on the basis that it was inconsistent with the record (factors three and four).  Regarding the first two factors, Doctor Paterson did not have a treatment relationship with Plaintiff and only examined Plaintiff once.

In finding the opinion of Dr. Paterson inconsistent with the record the ALJ references the whole record and specifically points to Exhibit 18F.[201]  Exhibit 18F is Plaintiff's new patient form created during his visit with Dr. Lawera in 2015.[202]  During the

---

[200]   See Tr. 429-430.

[201]   See Tr. 27, 30, 818.

[202]   See Tr. 818.

visit, Plaintiff was asked the following questions: (1) "Over the last two weeks, have you . . .[h]ad little interest or pleasure in doing things?[;]" (2) "Over the last two weeks, have you . . . [b]een feeling down, depressed, or hopeless?[;]" (3) "Over the last two weeks, have you been . . . [f]eeling nervous, anxious, or on edge?[;]" and (4) Over the last two weeks, have you been . . . unable to stop or control worrying?"[203]  To all four questions, Plaintiff responded "not at all."[204]  Additionally, Dr. Lawera noted that Plaintiff had "no depression, anxiety, or agitation."[205]

In addition to Exhibit 18F, the following provides additional evidence of the record's inconsistency with Dr. Paterson's opinion: (1) Plaintiff was not taking his medications for his PTSD and MDD for lengthy periods on at least three occasions; (2) Plaintiff's mental conditions were noticeably improving when he actually took his medications; and (3) at Plaintiff's most recent appointment, he stated that he had improved a lot and his PHQ-9 score had decreased to the mild depression level.[206]

When the five relevant factors are considered, it is apparent that the ALJ did not err in giving little weight to the opinion of Dr. Paterson.

---

[203]     See Tr. 818.

[204]     See Tr. 818.

[205]     See Tr. 820.

[206]     See Tr. 701, 761-762, 820, 842, 874, 943, 961-962.

B.    **Expert Opinion of Plaintiff's Mental Capabilities**

Plaintiff's argues that the ALJ erred by determining what Plaintiff's mental capabilities are without the interpretative opinion of any medical expert. Robert White, Ph.D. ("Dr. White"), and Norvin Curtis, Ph.D. ("Dr. Curtis"), both rendered opinions regarding Plaintiff's mental capabilities on December 19, 2014, and March 30, 2015.[207]  Both found that the medical evidence did not support Plaintiff's alleged limitations.[208]

Plaintiff cites Ripley v. Chater to support his contention that the ALJ erred by not using the opinion of a medical expert when considering how Plaintiff could function in a work environment with his impairment.[209]  67 F.3d 552 (5th Cir. 1995).  Firstly, Dr. White and Dr. Curtis found Plaintiff's alleged limitations inconsistent with the medical record.  While their analyses are limited, they arguably provide interpretive expert opinion of Plaintiff's mental capabilities.  Secondly, the Ripley court specifically stated that the ALJ is not in error if he or she does not have a medical source statement describing the types of work a plaintiff is capable of when the ALJ's decision is supported by substantial evidence.  See id. at 557.

The ALJ found that Plaintiff could perform sedentary work

---

[207]    See Tr. 68-69, 95-96.

[208]    See Tr. 69, 96.

[209]    See Doc. 16, Pl.'s Mot. for Summ. J. p. 14.

except that: (1) he could only occasionally climb ramps or stairs, never climb ladders, ropes, or scaffolds; (2) he could only occasionally stoop, kneel, and crouch; (3) he could never crawl or balance; (4) he must avoid all exposure to unprotected heights and hazardous machinery.[210]  To Plaintiff's physical RFC, the ALJ added the mental limitations that he could only: (1) perform simple, routine work; and (2) have occasional interaction with the public, coworkers, and supervisors.[211]

Given the evidence before the ALJ, the court cannot say that the ALJ did not have "that quantum of relevant evidence" before him "that a reasonable mind might accept as adequate to support [his] conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  The following shows some of the ways in which the record supports the ALJ's finding that Plaintiff could only do simple, routine work and occasionally interact with the public, coworkers, and supervisors: (1) at an appointment with Dr. Lawera, Plaintiff stated that he was not depressed, anxious, nervous, on edge, or unable to stop worrying; (2) Plaintiff was not taking his medications for his PTSD and MDD for lengthy periods on at least three occasions; (3) Plaintiff's mental conditions noticeably improved when he actually took his medications; and (4) at Plaintiff's most recent appointment, he stated that he had improved a lot and his PHQ-9

---

[210]   See Tr. 24.

[211]   See Tr. 24.

score had improved to the mild depression level.[212]   The ALJ carefully considered Plaintiff's medical records in coming up with Plaintiff's RFC and added appropriate mental capability limitations that are supported by substantial evidence.

Lloyd, the vocational expert, testified that a person with Plaintiff's age, education, past work experience, and RFC, would be capable of working as a document preparer, call out operator, and surveillance system monitor.[213]   Based on this testimony, the ALJ concluded that through the date of the decision, Plaintiff "was not under a disability, as defined in the Social Security Act."[214]

There is no evidence suggesting that Lloyd's conclusion was incorrect.   Accordingly, substantial evidence supports the ALJ's conclusion that Plaintiff was capable of doing other work and, therefore, Plaintiff was not disabled through the date of the decision.

## IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Defendant's motion be **GRANTED** and Plaintiff's motion be **DENIED.**

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto

---

[212]   See Tr. 701, 761-762, 820, 842, 874, 943, 961-962.

[213]   See Tr. 60.

[214]   See Tr. 32.

36

pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.  Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.  Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 20<u>th</u> day of February, 2019.

_____

U.S. MAGISTRATE JUDGE

37